[Cite as *Stewart v. Vivian*, 2016-Ohio-2892.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| DENNIS STEWART, Individually and as The Administrator of the Estate of Michelle Stewart, Deceased, | : | |
| | : | CASE NO. CA2015-05-039 |
| Plaintiff-Appellant, | : | O P I N I O N<br>5/9/2016 |
| | : | |
| - vs - | | |
| | : | |
| RODNEY E. VIVIAN, M.D., | : | |
| Defendant-Appellee. | : | |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2011 CVA 00318

Stagnaro, Saba & Patterson Co., L.P.A., Peter A. Saba, 2623 Erie Avenue, Cincinnati, Ohio 45208, for plaintiff-appellant

Arnzen, Storm & Turner, P.S.C., Aaron A. VanderLaan, 600 Greenup Street, Covington, KY 41011, for defendant-appellee

**HENDRICKSON, J.**

{¶ 1} Plaintiff-appellant, Dennis Stewart, Individually and as the Administrator of the Estate of Michelle Stewart, Deceased (collectively, "Stewart"), appeals from a judgment entered on a jury verdict in the Clermont County Court of Common Pleas in favor of defendant-appellee, Rodney E. Vivian, M.D., on Stewart's medical malpractice and wrongful

death claims. Stewart also appeals the trial court's denial of his motion for judgment notwithstanding the verdict, or alternatively, motion for a new trial, arguing that Dr. Vivian should have been found liable for his negligence in assessing, treating, and caring for Stewart's wife, Michelle, while she was hospitalized at Mercy Clermont Hospital ("Mercy") on a 72-hour psychiatric hold. Michelle died at Mercy a few days after she was found hanging from the bathroom door of her hospital room. For the reasons set forth below, we affirm.

## I. FACTS

{¶ 2} On February 19, 2010, Michelle attempted suicide by overdosing on drugs. She was treated for the overdose at Mercy Mt. Orab Hospital ("Mt. Orab"). The treating physician at Mt. Orab determined Michelle should be placed on a 72-hour psychiatric hold as Michelle was upset she had survived her suicide attempt and she indicated a continued desire to kill herself. Because Mt. Orab does not have a psychiatric unit, Michelle was transferred to Mercy.

{¶ 3} Michelle was admitted to Mercy just after midnight on February 20, 2010. Although Dr. Vivian was the admitting and treating physician, he was not present at the hospital when Michelle arrived. Leslie Wiggs, a registered nurse, performed the initial assessment on Michelle, which included interviewing Michelle and filling out a "Comprehensive Clinical Assessment and Evaluation Tool" and "Lethality Assessment" form. Wiggs found Michelle cooperative with the assessment, observing that Michelle was only "mildly agitated" upon her arrival at Mercy. While conducting the assessment, Wiggs noted Michelle admitted to being suicidal since age nine, felt like a burden on her family, and had "lots of plans." In notes made about her interaction with Michelle, Wiggs documented that Michelle "continue[d] to state she [was] suicidal," was upset she was found breathing, and had been researching suicide for 25 years. However, Wiggs recalled Michelle stating she would never hang herself because she did not want to "piss and shit" herself.

- 2 -

{¶ 4} The Lethality Assessment form Wiggs completed showed Michelle met more than four risk factors indicating a high level of lethality. According to this form, "[a]ny patient meeting High Lethality should be assigned a 'Safety Proofed Room.'" Wiggs explained, however, that this specific form was not supposed to be used at Mercy and Mercy did not have the referenced "Safety Proofed Rooms." According to Wiggs, the form just "showed up in the admissions packet one day."[1]

{¶ 5} Following her assessment of Michelle, Wiggs spoke with Dr. Vivian via telephone to discuss Michelle's condition. During this conversation, Dr. Vivian ordered that Michelle be placed on "15-minute checks," a level of observation that required a hospital staff member to visually check on Michelle every 15 minutes. According to Wiggs, 15-minute checks were regularly implemented in the psychiatric unit, although there were other types of observation Michelle could have been placed under, including arm's-length observation, one-to-one observation, and constant observation.[2] As a psychiatric nurse, Wiggs had the ability to go to the treating physician and ask that the level of observation for a patient be increased if she felt the patient posed a danger to the patient's self or to others. Wiggs never requested Michelle's level of observation be elevated from 15-minute checks as Michelle had never indicated an intent to harm herself while at Mercy.

{¶ 6} After being placed on 15-minute checks, Michelle interacted and was observed by a number of Mercy's staff. Richard Todd Tudor, a registered nurse on the day shift, spoke with Michelle multiple times throughout the day on February 20, 2010. Tudor indicated Michelle was unhappy about being admitted to Mercy and was seeking a transfer to another

---

1. There was some testimony at trial indicating that the form had been created by and used at a neighboring sister hospital. The "Safety Proofed Room[s]" referenced in the form correlated to the sister hospital's rooms.

2. When a patient is placed on arm's-length observation, a hospital staff member is assigned to stay within an arm's length of the patient at all times. Under one-to-one observation, a staff member is assigned to stay with the patient at all times. If a patient is placed on constant observation, a staff member is assigned to constantly observe the patient via video or in an open area.

facility. Tudor noticed Michelle became irritable and agitated as the day wore on, and he made verbal attempts to deescalate her irritability. Tudor did not, however, administer medication to calm Michelle as he had concerns about the additional drugs "cloud[ing] her mentation following [her] medication overdose." Tudor discussed Michelle's irritability with Dr. Vivian, who determined Michelle should not be prescribed medication for her irritability and agitation.

{¶ 7} Based on his interactions with Michelle, Tudor determined Michelle was passively, rather than actively, suicidal.[3] Michelle had not made any direct suicide statements to Tudor nor had he been approached by another nurse or staff member regarding any concerns about Michelle's conduct or behavior. Tudor believed the 15-minute checks were an appropriate level of observation for Michelle, and he did not request that Dr. Vivian increase Michelle's level of observation.

{¶ 8} Jamie Christian, a mental health technician at Mercy, also performed 15-minute checks on Michelle. During Christian's interactions with Michelle, Michelle never made any statements that she intended to harm herself. Christian did observe that Michelle had become very upset and agitated after receiving a visit from her mother and sister. According to Christian, Michelle began yelling, cursing, and saying she wanted to leave Mercy. In addition to noticing Michelle's increased agitation, Christian caught Michelle standing on her bed on a couple of occasions. When asked what she was doing, Michelle told Christian she was just anxious because she wanted to leave Mercy and she was not allowed to smoke. Christian reported this behavior to Debbie Drennan, a nurse in the psychiatric unit, but neither Christian nor Drennan reported Michelle's unusual behavior to Dr. Vivian.

---

3. Tudor explained a person is actively suicidal when that person is "thinking of suicide at that moment." Conversely, a person is passively suicidal when the act of suicide is in the back of the person's mind and the person does not intend to act upon it.

{¶ 9} Christian did, however, communicate Michelle's agitation and her desire to be transferred to another facility to Dr. Vivian. According to Christian, Dr. Vivian stated he "was aware of that" and that "she [Michelle] scared him and to keep a very good eye on her."

{¶ 10} Dr. Vivian and Jeanne Toebbe, a clinical psychiatric social worker, both met with and assessed Michelle on February 20, 2010. Dr. Vivian met with Michelle in the early afternoon. Dr. Vivian's interview with Michelle was limited as Michelle refused to cooperate or talk with him. Michelle would not respond to Dr. Vivian's questions, choosing to look away from him or put her head down on a table. When Michelle did talk to Dr. Vivian, she spent the majority of her time discussing how angry she was with her husband. Based on Michelle's refusal to cooperate during the interview, Dr. Vivian was unable to develop a firm idea as to whether Michelle's attempted overdose was a true suicide attempt or merely a cry for help. Dr. Vivian did observe, however, that even though Michelle was sad, preoccupied, and irritable during this assessment, she was alert and oriented to her surroundings.

{¶ 11} As part of his assessment, Dr. Vivian reviewed Michelle's medical records, including Mt. Orab's emergency room report, the admission forms completed by Wiggs, and records pertaining to Michelle's prior 2006 admission to Mercy's psychiatric unit.[4] The report from Mt. Orab stated Michelle expressed suicidal ideation, had definite suicidal thoughts, and had a plan. Wiggs' comments on the admission forms also informed Dr. Vivian of Michelle's history of suicidal thoughts. Considering the information contained in these forms, as well as information he gleaned from various Mercy staff members who had observed Michelle's conduct and behavior since her admission to the hospital, Dr. Vivian concluded that 15-minute checks were the appropriate level of observation. He therefore ordered that the checks be continued.

---

4. In 2006, Michelle voluntarily entered a 72-hour hold at Mercy after admitting to suicidal thoughts. Michelle did not stay the full 72 hours, but rather checked herself out of the hospital a day after being admitted.

{¶ 12} Dr. Vivian made a written record of his assessment of Michelle, in which he noted that Michelle was a "poor disorganized historian" who had "mood problems for many years" before deciding to "just g[i]ve up." Dr. Vivian found Michelle had "grossly impaired judgment and insight," and he acknowledged that Michelle had continued to state that she "want[s] to be dead."

{¶ 13} Following Dr. Vivian's assessment, Michelle met Toebbe, the hospital's psychiatric social worker. Michelle discussed a variety of issues with Toebbe, including difficulties from her childhood, her daily use of alcohol and marijuana, her interest in seeking treatment for her mental health problems, her potential support systems, and the events leading up to her admittance in Mercy's psychiatric unit. With respect to the latter, Michelle explained to Toebbe that she and Stewart had gotten into an argument and she became very upset. She went to a hotel, contacted some friends to tell them that she planned to kill herself, and then proceeded to attempt to overdose on a combination of alcohol and prescription and nonprescription drugs, including klonopin, zanaflex, and extra strength Tylenol. Michelle expressed disappointment that she had "woken up alive," but indicated to Toebbe that she "wasn't sure" if she was still suicidal. Michelle never told Toebbe that she intended to harm herself, and in fact, indicated her desire to get her mood stabilized while at Mercy. Based on her interaction with Michelle, Toebbe had no concerns about Michelle's treatment, level of observation, or safety at Mercy. Toebbe, therefore, did not speak with Dr. Vivian or any of his nursing staff about Michelle.

{¶ 14} Around 6:00 p.m. on February 20, 2010, Stewart arrived at Mercy to visit with Michelle. Upon entering Michelle's room, Stewart found an unconscious and discolored Michelle hanging from a ligature attached to the bathroom door. The ligature had been fashioned out of bedsheets. Stewart called for help, and Christian and Drennan came to his assistance.

{¶ 15}  An unresponsive Michelle was transferred to Mercy's intensive care unit ("ICU") for treatment.  There, she was visited by family, friends, and Dr. Vivian.  Medical tests revealed that Michelle was brain dead.  She survived on life support for a few days before eventually passing away on February 24, 2010.

## II.  PROCEDURAL HISTORY

{¶ 16}  On February 17, 2011, Stewart, on his own behalf and on behalf of Michelle's estate, filed suit against Mercy and Dr. Vivian.  With respect to Mercy, Stewart asserted claims of medical malpractice, res ipsa loquitor, negligence per se, loss of consortium, loss of chance, wrongful death, and respondeat superior.  Stewart claimed Mercy's employees failed to act within the accepted standard of medical practice in assessing and identifying Michelle's imminent risk of suicide, in providing a safe environment of care, in providing and performing patient observations, and in training, instructing, or supervising its employees.  With respect to Dr. Vivian, Stewart also asserted claims of medical malpractice, loss of consortium, loss of chance, and wrongful death.  Stewart alleged that Dr. Vivian failed to act within the accepted standard of medical practice among members of the profession with similar training and experience by failing to appropriately assess, test, diagnose, and treat Michelle's condition.  Both Mercy and Dr. Vivian filed answers denying the allegations set forth in the complaint.

{¶ 17}  In January 2013, Stewart dismissed his claims against Mercy after the parties reached a settlement.  Stewart proceeded with his claims against Dr. Vivian, and the parties engaged in lengthy discovery.  In the midst of discovery, Dr. Vivian filed multiple motions in limine to exclude certain evidence from being admitted at trial.  Specifically, Dr. Vivian sought to prevent Stewart from introducing evidence of Dr. Vivian's status as medical director at Mercy hospital and evidence relating to statements Dr. Vivian made to Michelle's family when visiting Michelle in the ICU.

{¶ 18}  Regarding the motion in limine to exclude evidence of his status as medical

director, Dr. Vivian argued his position as medical director was irrelevant to Stewart's claim that he failed to appropriately "assess, test, diagnose, and treat" Michelle's condition. Dr. Vivian contended Stewart only sought to introduce evidence of his status as medical director in an effort to elevate in the jury's mind the standard of care he was obligated to operate under and to try to raise an argument about the "environment of care" at Mercy hospital. Dr. Vivian claimed that the issues surrounding the duty to provide a safe environment of care for Michelle had been resolved when Mercy entered into a settlement agreement with Stewart. Dr. Vivian argued Stewart "should not be permitted to litigate the alleged deficiencies of Mercy Clermont against Dr. Vivian simply because he was the medical director at the hospital." The trial court agreed with Dr. Vivian's arguments and granted the motion in limine, finding that Dr. Vivian's role as medical director did not make it more or less likely that he was negligent in his care of Michelle. The court did, however, indicate it would allow questioning as to Dr. Vivian's knowledge of environmental hazards contained at Mercy hospital and in Michelle's room. If Dr. Vivian denied knowledge about such hazards, the court stated it would allow Stewart to use the excluded evidence for impeachment purposes.

{¶ 19} Regarding the motion in limine to exclude statements Dr. Vivian made to Michelle's family in the ICU, Dr. Vivian argued that any statements he made were inadmissible pursuant to Ohio's apology statute, R.C. 2317.43. Dr. Vivian contended that anything he may have said while visiting Michelle in the ICU was inadmissible as evidence of liability as his statements had been offered to Michelle's family in condolence, commiseration, and sympathy. Stewart opposed Dr. Vivian's motion, arguing that certain statements made by Dr. Vivian in the ICU were not designed to comfort Michelle's family, but rather were statements against interest, or "fault statements," that were admissible under Ohio law. Specifically, Stewart sought to introduce statements showing that Michelle had told Dr. Vivian she intended to kill herself at Mercy hospital.

{¶ 20} After holding a hearing, in which the trial court obtained testimony from Dr. Vivian, Stewart, and Michelle's sister, Stacey Sackenheim, about Dr. Vivian's visit to Michelle's ICU room, the trial court granted the motion in limine. The court determined that Dr. Vivian's statements were an "ineffective attempt at commiseration" and that such statements were inadmissible pursuant to the apology statute.

{¶ 21} A jury trial was held March 10, 2014, through March 25, 2014. At trial, 20 witnesses testified, including friends and family members of Michelle, hospital personnel from Mercy's psychiatric unit, and experts in the fields of psychiatry and forensic psychiatry. Among the friends and family members who testified were Stewart, Michelle's mother, Michelle's sister Billie Kay Elam, and Michelle's employer, Rene Paroz. All of these individuals had visited with Michelle on March 20, 2010, in the psychiatric unit, and they all testified that Michelle was "disturbed" and "upset" about being hospitalized in Mercy's psychiatric unit. Michelle told her mother, Stewart, and Elam that she did not think she could get the help she needed at Mercy and she wanted to be transferred to another facility. At the same time that Michelle indicated she wanted to get help for her problems, she also told her family and friends she "didn't want to be a part of this world." Michelle's family and friends described Michelle as "very agitated" in the psychiatric unit, and both Paroz and Stewart testified that they sought out and spoke with Michelle's nurses out of concern for her well-being. Stewart told one of the nurses that Michelle was "still very suicidal."

{¶ 22} Dr. Vivian testified at trial about his assessment and treatment of Michelle. He explained that when he assessed Michelle and she refused to answer his questions, he chose not to push her for answers because he did not want to "drill her" or risk pushing her further away. He also explained that although he was aware Michelle's family and friends had been visiting her, he did not speak with any them to obtain additional information about Michelle's state of mind because Michelle never gave him permission to do so and he did not

want to risk alienating Michelle. Further, Dr. Vivian testified he did not put Michelle on constant observation or in a seclusion room because he believed it would antagonize her and make her more resentful. Dr. Vivian stated he weighed all considerations and factors, including the least restrictive environment to keep Michelle safe and the best way to maintain a relationship with her, before concluding that 15-minute checks was the proper treatment and an appropriate level of observation for Michelle. Dr. Vivian denied ever stating that Michelle "scared" him, but he did recall asking Christian to "watch [Michelle] closely for me."

{¶ 23} On cross-examination, Dr. Vivian admitted he was aware that the bathroom doors in the patients' rooms at Mercy had been identified as a hazard following a prior hanging attempt by another patient. Dr. Vivian acknowledged he knew it was possible to hang a ligature on the handle of the bathroom door and that the straight-edge top of the door could work as an anchor point for a ligature. Even with this knowledge, Dr. Vivian believed 15-minute checks were an appropriate level of observation as he "didn't feel that [Michelle] represented a risk of doing anything."

{¶ 24} Dr. Vivian was asked on cross-examination whether "it's possible that you actually did ask Michelle whether she planned on killing herself in the hospital, and that she said yes, but you just didn't put it in [your] record[s], correct?" Dr. Vivian responded by saying, "I'm sure that's possible. But I don't think so." When asked again by Stewart's counsel whether it was possible, Dr. Vivian stated, "It's possible."

{¶ 25} At trial, Dr. Vivian was also asked about his previously expressed premise that it is impossible for a person on 15-minute checks to hang themselves.[5] Dr. Vivian admitted this premise was wrong and that it was possible for a patient to commit suicide while on 15-

---

5. Prior to trial, Dr. Vivian was deposed. At his deposition, Dr. Vivian stated he originally thought that the 15-minute checks he had ordered for Michelle had not been performed. Dr. Vivian believed it was impossible for someone to commit suicide by hanging while on 15-minute checks. However, after more information about Michelle's treatment and observation came to light, Dr. Vivian conceded it was possible for a patient to commit suicide by hanging while on 15-minute checks.

minute checks. Dr. Vivian explained he had been treating patients for "nearly 35 years, [and] this is the first time in my life - - in my career this has ever happened." Even though he had been operating under a wrong assumption, Dr. Vivian maintained that the 15-minute checks ordered for Michelle were the appropriate level of observation.

{¶ 26} In addition to the lay witnesses who testified at trial, the parties both presented expert testimony in support of their respective positions. Dr. Mace Beckson and Dr. Todd Palumbo, psychiatrists, testified on behalf of Stewart. Dr. Beckson opined to a reasonable degree of medical probability that Dr. Vivian fell below the standard of care in his assessment and treatment of Michelle as Dr. Vivian did not do what a reasonably careful psychiatrist would do under similar circumstances. With respect to the assessment Dr. Vivian conducted, Dr. Beckson opined that Dr. Vivian should have questioned Michelle more thoroughly to obtain information about her thoughts of suicide and any plans she may have made to end her life. He also believed Dr. Vivian should have obtained collateral information about Michelle's life and suicidal ideations from her family members in order to effectively treat and care for Michelle.

{¶ 27} Dr. Beckson opined that 15-minute checks were not an appropriate level of observation for Michelle given that she had a prior suicide attempt, had shared she had different ideas on how to kill herself, and was found to have "grossly impaired judgment and insight." Beckson stated one "can't be reasonably careful knowing that she's grossly impaired in her insight and judgment and then put her on 15-minute checks." He also testified that Dr. Vivian would have known about the environment of care hazards in Michelle's hospital room, and that "you can't let someone with grossly impaired judgment and grossly impaired insight * * * go in that room and close the door knowing that the sheets are in there, the doorknob is the same as with the previous hanging, the straight top of the door is ready to bear weight."

{¶ 28} Dr. Palumbo agreed that Dr. Vivian fell below the standard of care in assessing and treating Michelle. He opined that Dr. Vivian failed to complete a full assessment of Michelle as Dr. Vivian's assessment lacked collaborative information from Michelle's family and lacked a risk assessment. With regard to completing a risk assessment, Dr. Palumbo stated, "one of the things that we ultimately do as psychiatrists when we first meet someone in our inpatient unit is to formally assess for risk, particularly if someone comes into the hospital having just attempted suicide. We need to understand where their thoughts are at that time when they're in the hospital, and that was something I did not see as part of the initial assessment." Dr. Palumbo also testified that if Michelle had informed Dr. Vivian she intended to kill herself, then "[a]t [a] minimum," Michelle should have been placed under constant observation or one-to-one supervision. If Michelle had been placed on constant observation or one-to-one observation, Dr. Palumbo believed it would have been "near impossible for her to have completed suicide." In Dr. Palumbo's opinion, Dr. Vivian was also negligent in his treatment of Michelle for failing to provide pharmacologic intervention and placing her in an unsafe environment. Dr. Palumbo believed "it would have been significantly beneficial for [Michelle] to be started on medication, particularly since she was in an agitated state and to alleviate some of that behavior she was exhibiting."

{¶ 29} Two expert psychiatrists, Dr. Terry Correll and Dr. Douglas Songer, testified on behalf of Dr. Vivian. Dr. Correll testified that suicide can occur in a hospital in the absence of negligence. He explained it is possible for a patient to harm herself in a hospital regardless of the level of observation the patient has been placed on. In Michelle's case, Dr. Correll determined to a reasonable degree of medical probability that Dr. Vivian met the standard of care in his treatment and care of Michelle. In Dr. Correll's opinion, 15-minute checks with suicide precautions were appropriate as Michelle's behavior did not warrant an increased level of observation. Dr. Correll spoke about the "protective factors" indicating a patient's

ability to overcome her suicidal thoughts and noted that Michelle had many factors in her favor, including gainful employment for over 13 years, a recent marriage, a good relationship with her stepson, and future plans to complete college and become pregnant.

{¶ 30} Dr. Correll testified a doctor can attempt to obtain collateral information from a patient's family members, but this can hurt the doctor's relationship with the patient. With respect to Dr. Vivian's decision not to administer medication to Michelle, even in the face of her growing agitation, Dr. Correll explained that foregoing medications was appropriate given her recent overdose. Dr. Correll believed it was necessary to be "conservative" in administering medication, especially in light of Michelle's dependency and recent use of alcohol.

{¶ 31} Dr. Songer also testified Dr. Vivian met the standard of care required of him in his treatment and assessment of Michelle. He agreed with Dr. Correll that suicide can occur in the absence of medical negligence, and he stated patients in his practice that are placed on 72-hour holds are "almost always" put on 15-minute checks. He opined that Michelle was not actively suicidal for most of the day on February 20, 2010, and that there was no imminent risk of suicide for Michelle until it actually happened. He indicated that he would not have done anything differently than Dr. Vivian had he been the doctor treating Michelle.

{¶ 32} After hearing testimony from the parties' expert and lay witnesses, the jury returned a verdict in favor of Dr. Vivian, concluding he was not negligent in his assessment care, or treatment of Michelle. Thereafter, Stewart filed a motion for judgment notwithstanding the verdict, or in the alternative, a motion for new trial. The trial court denied the motion on April 6, 2015, finding there was sufficient evidence to support the jury verdict and that the verdict was not against the manifest weight of the evidence.

{¶ 33} Stewart timely appealed, alleging errors related to the trial and to the denial of his motion for judgment notwithstanding the verdict or motion for new trial.

- 13 -

### III. ANALYSIS

### A. Ohio's Apology Statute

{¶ 34} Assignment of Error No. 1:

{¶ 35} THE COURT ERRED TO THE PREJUDICE OF [STEWART] IN DENYING ADMISSION PURSUANT TO ORC § 2317.43 (THE OHIO APOLOGY STATUTE) OF TESTIMONY FROM DECEDENT'S HUSBAND AND SISTER THAT DR. VIVIAN ADMITTED THAT MICHELLE TOLD HIM SHE WOULD COMMIT SUICIDE IN THE HOSPITAL, BECAUSE STATEMENTS OF FAULT AND STATEMENTS AGAINST INTEREST ARE NOT EXCLUDED FROM EVIDENCE BY THE STATUTE.

{¶ 36} In his first assignment of error, Stewart argues the trial court erred when it granted Dr. Vivian's motion in limine to exclude from evidence Stewart's and Sackenheim's testimony about statements Dr. Vivian made to them in Michelle's ICU room. Stewart contends the apology statute does not exclude an admission of fault or other statements against interest made contemporaneously with an expression of sympathy or apology from being introduced into evidence. Stewart maintains the exclusion of this evidence was prejudicial as the jury would have reached a different result on his medical malpractice claim had they heard *all* of the relevant evidence.

{¶ 37} At the hearing on Dr. Vivian's motion in limine, the trial court heard testimony from Stewart and Sackenheim regarding the statements Dr. Vivian made to them in the ICU. Stewart testified as follows:

> [STEWART]: There was a few family members still in the room. I was sitting on the right hand side of her bed up towards her head. Dr. Vivian walked in. I kind of tried to ignore him basically. Kept my focus mostly on Michelle. I do remember him saying a few things. I don't remember him asking me anything about how it happened. *I just remember him saying that he didn't know how it happened; it was a terrible situation, but she had just told him that she still wanted to be dead, that she wanted to kill herself,*

and at that point I asked him well, why didn't you keep a closer eye on [her].

And I was immediately frustrated, and I realized that I was going to lose my temper, so at that point I just didn't even accept his answer. I just asked him to leave. I said, I think it's better if you just left. We don't need you here. I'm about ready to lose my temper, and I don't think it's a good situation.

Q: At any point in time, did Dr. Vivian do anything to apologize or do anything that you interpreted as some expression of sympathy or to try to make the family feel better?

[STEWART]: I - - I didn't interpret it that way.

(Emphasis added.)

{¶ 38} Similarly, Sackenheim testified that the following occurred when Dr. Vivian visited Michelle's ICU room:

[SACKENHEIM]: We were in the ICU room where Michelle was. This was - - I believe it was Monday the - - which would be two days after she was placed in ICU, and just myself, Dennis, my father, and then an aunt were present in the room - - just everybody taking turns visiting her. And Dr. Vivian just walked in through the door and walked over to - - towards the end of Michelle's bed, and kind of stood for a moment and then just said, so what do you think happened here?

And I believe Dennis responded and ex - - and said, well, obviously she tried to kill herself. *And he said, yeah, she said she was going to do that. She told me she would keep trying.* And Dennis said, well, why didn't you watch her closer then? And Dennis clearly got upset pretty much immediately at - - at the, you know, conversation, and then Dr. Vivian stood for another minute and then he proceeded to - - you know, standing at the end of her bed - - started to say Michelle - - you know, in kind of a raised voice - - Michelle.

And, you know, she was intubated and unconscious, and I just got very upset at that moment and said that I felt that he should leave. * * *

Q: At any time, did Dr. Vivian express any apology or any sympathy to you or any other family members or Michelle?

[SACKENHEIM]: No.

- 15 -

(Emphasis added.)

{¶ 39} Dr. Vivian testified he had gone to the ICU room to "express how deeply sorry I was." Although he testified at the motion in limine hearing that he remembered telling Michelle's family he "was sorry," Dr. Vivian's deposition testimony demonstrated that he could not remember exactly what he said to the family. When deposed, Dr. Vivian admitted, "I made a statement, but I don't remember what I said. * * * I don't remember. Obviously, I'm deeply sorry."

{¶ 40} After hearing the foregoing testimony, the trial court concluded that Dr. Vivian's statements to the family were an "ineffective attempt at commiseration." The court stated, "I don't believe that Dr. Vivian remembers that - - whether he said I'm sorry or not. He said in his deposition I don't remember what was said. That seems to me to be the more credible version." However, the court nonetheless determined the purpose behind Dr. Vivian's visit and statements to the family were to apologize and commiserate with the family.

{¶ 41} With this in mind, the court determined Dr. Vivian's ICU statements were not admissible under the apology statute. Examining the word "apology," the trial court stated:

> An apology can be made to - - in the process of commiserating, but apology can also be made because you're trying to calm a situation down. Apology can be made because you're trying to take responsibility for your own actions. Apology really is something different than these other things. And an apology it seems to me can include a statement of fault and - - which is part of the statement of apology.

The court determined the legislature did not intend to "parse out" a statement of fault from a statement intended to give comfort. The court, therefore, held that Stewart could not introduce evidence of Dr. Vivian's ICU statements at trial.

{¶ 42} Generally, a trial court's decision to admit or exclude evidence is reviewed under an abuse-of-discretion standard. *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20. Similarly, a trial court's decision to grant a motion in limine is

- 16 -

generally reviewed under an abuse-of-discretion standard. *Illinois Controls, Inc. v. Langham*, 70 Ohio St.3d 512, 526 (1994). However, when a trial court's evidentiary decision is based on an interpretation of a statute, a question of law has been presented that requires de novo review. *See, e.g., Med. Mut. of Ohio v. Schlotterer*, 122 Ohio St.3d 181, 2009-Ohio-2496, ¶ 13 (recognizing that although discovery orders are generally reviewed under an abuse-of-discretion standard, review of whether the information sought to be discovered was confidential and privileged was a question of law that is to be reviewed de novo); *State v. Knecht,* 12th Dist. Warren No. CA2015-04-037, 2015-Ohio-4316, ¶ 20 (recognizing that although evidentiary rulings are generally reviewed under an abuse-of-discretion standard, the claim that the exclusion of evidence violated a defendant's rights under the Confrontation Clause required a de-novo standard of review); *State v. Depew*, 136 Ohio App.3d 129, 132 (4th Dist.1999) (finding that while an abuse-of-discretion standard of review generally applied to evidentiary rulings, a challenge to "the trial court's construction of an evidentiary rule * * * presents a question of law that we review de novo").[6]

{¶ 43} Ohio's apology statute provides, in relevant part, the following:

> (A) In any civil action brought by an alleged victim of an unanticipated outcome of medical care or in any arbitration proceeding related to such a civil action, *any and all statements*, affirmations, gestures, or conduct *expressing apology, sympathy, commiseration, condolence, compassion, or a general sense of benevolence* that are made by a health care provider or an

---

6.   {¶ a}    We recognize that in *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, the Ohio Supreme Court applied an abuse-of-discretion standard of review to the determination of whether a doctor's statement was admissible under the apology statute. *Id.* at ¶ 22. However, in *Johnson*, the supreme court was not asked to interpret the statute to determine what types of statements were encompassed or excluded under the statute. Rather, the supreme court was asked to determine whether the apology statute could be applied to a statement of apology made by a healthcare provider before the statute took effect. *Id.* at ¶ 1. After concluding that the statute applies to any cause of action filed after September 13, 2004, the court upheld the trial court's exclusion of a doctor's statement to a patient that the doctor "took full responsibility for this. Everything will be okay." *Id.* at the syllabus and ¶ 22.

{¶ b}    The present case differs from *Johnson* as this court has been asked to interpret the statute to determine whether the statute prohibits statements admitting liability or indicating fault from being admitted into evidence. As this involves a question of law, de novo review is proper. *See Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 30.

employee of a health care provider to the alleged victim, a relative of the alleged victim, or a representative of the alleged victim, and *that relate to the discomfort, pain, suffering, injury, or death of the alleged victim as the result of the unanticipated outcome of medical care are inadmissible as evidence of an admission of liability or as evidence of an admission against interest.*

(Emphasis added.)  R.C. 2317.43(A).

**{¶ 44}**  In construing this statute, the primary goal "is to ascertain and give effect to the intent of the legislature as expressed in the statute."  *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 30.  *See also Henry v. Cent. Natl. Bank,* 16 Ohio St.2d 16, (1968), paragraph two of the syllabus.  Legislative intent is determined from the plain language of the statute.  *Summerville v. Forest Park,* 128 Ohio St.3d 221, 2010-Ohio-6280, ¶ 18.  "If the meaning of the statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary."  *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.,* 74 Ohio St.3d 543, 545 (1996).  However, when a statute is ambiguous, a court must interpret the statute to determine the General Assembly's intent.  *Sherwin-Williams Co. v. Dayton Freight Lines, Inc.*, 112 Ohio St.3d 52, 2006-Ohio-6498, ¶ 15, citing *State v. Hairston*, 101 St.3d 308, 2004-Ohio-969, ¶ 13.  "In order to determine that intent, the court may consider a host of factors, including the object sought to be obtained by the statute."  *Family Medicine Found., Inc. v. Bright*, 96 Ohio St.3d 183, 2002-Ohio-4034, ¶ 9, citing R.C. 1.49.[7]

**{¶ 45}**  Only one other court has examined the apology statute to determine whether it prohibits statements of fault or statements admitting liability from being admitted at trial.  *See Davis v. Wooster Orthopaedics & Sports Medicine, Inc.,* 193 Ohio App.3d 581, 2011-Ohio-

---

7. R.C. 1.49 provides that "[i]f a statute is ambiguous, the court, in determining the intention of the legislature, may consider among other matters:  (A) [t]he object sought to be attained; (B) [t]he circumstances under which the statute was enacted; (C) [t]he legislative history; (D) [t]he common law or former statutory provisions, including laws upon the same or similar subjects; (E) [t]he consequences of a particular construction; [and] (F) [t]he administrative construction of the statute."

3199 (9th Dist.). In *Davis*, the Ninth District recognized that Ohio's apology statute, unlike the majority of other states' apology statutes, does not "make a clear distinction between an alleged tortfeasor's statement of sympathy and one acknowledging fault." *Id.* at ¶ 8.[8] Looking at the language of the statute, the Ninth District determined that "the appearance of the term 'apology' in R.C. 2317.43(A) creates some ambiguity." *Id.* at ¶ 10. The court found that the term "apology" could include "at least an implication of guilt or fault." *Id.* On the other hand, the court noted, "when hearing that someone's relative has died, it is common etiquette to say, 'I'm sorry,' but no one would take that as a confession of having caused the death." (Internal quotation marks omitted.) *Id.*, quoting *Schaaf v. Kaufman*, 850 A.2d 665, 664 (Pa.Super.Ct.2004).

{¶ 46} After concluding that R.C. 2317.43(A) is ambiguous, the Ninth District looked to the intent of the statute, stating

> the Ohio General Assembly "enact[ed] section 2317.43 * * * to prohibit the use of a defendant's statement of sympathy as evidence in a medical liability action." Sub.H.B. No. 215, 150 Ohio Laws, Part III, 4146 ("H.B. 215"). From the time that H.B. 215 was first introduced in the 125th General Assembly, the "Bill

---

8. **{¶ a}** As the *Davis* court acknowledged, the majority of states that have adopted apology statutes explicitly distinguish between statements of sympathy and admissions of fault or liability. *Davis* at ¶ 6-8. Of these states, 17 have chosen to admit expressions of fault while excluding from evidence any part of a statement that expresses sympathy. *See, e.g.,* Cal.Evid.Code 1160(a); Del.Code Ann. Title 10, Section 4318; Fla.Stat.Ann. 90.4026; Haw.Rev.Stat. Ann. 626-1, Rule 409.5; Idaho Code Ann. 9-207; Ind.Code Ann. 34-43.5-1-4 and 34-43.5-1-5; La.Rev.Stat.Ann. 13:3715.5; Me.Rev.Stat.Ann. Title 24, Section 2907; Md.Code Ann., Cts. & Jud. Proc. Section 10-920; Mass.Gen. Laws Ann. Ch. 233, 23D; Mich.Comp.Laws Ann. 600.2155; Mo.Ann.Stat. 538.229; Neb.Rev.Stat.Ann. 27-1201; N.H.Rev.Stat.Ann. 507–E:4; Tenn.R.Evid. 409.1; Tex.Civ.Prac. & Rem.Code Ann. 18.061; Va.Code Ann. 8.01-52.1. Seven other states have chosen to explicitly exclude both fault statements and expressions of sympathy from evidence. *See, e.g.,* Ariz.Rev.Stat.Ann. 12-2605; Colo.Rev.Stat.Ann. 13-25-135; Conn.Gen.Stat.Ann. 52-184d; Ga.Code Ann. 24-3-37.1; S.C.Code Ann. 19-1-190; Vt.Stat.Ann. Title. 12, 1912; Wash.Rev.Code Ann. 5.64.010.

**{¶ b}** The remaining states have apology statutes similar to Ohio's statute. These statutes do not make a clear distinction between a statement of sympathy and a statement acknowledging fault. *See, e.g.,* Mont.Code Ann. 26-1-814; N.D.Cent.Code 31-04-12; Okla.Stat.Ann. Title 63, 1-1708.1H; Utah Code Ann. 78B-3-422; W.Va.Code Ann. 55-7-11a; Wyo.Stat.Ann. 1-1-130. Among these states, only Utah has had cause to interpret its apology statute. *See Lawrence v. MountainStar Healthcare*, 320 P.3d 1037 (Utah Ct.App.2014). There, the Utah Court of Appeals determined that use of the term "apology" in the statute created an ambiguity as to whether statements of fault should or should not be excluded from evidence in a civil trial. *Id.* at 1050. After looking at the history or the statute as it passed through Utah's House of Representatives and Senate, the court concluded that the Utah legislature had not intended to exclude statements of fault under Utah Code Ann. 78B-3-422. *Id.* at 1051.

Summary" indicated that it would "[p]rohibit the use of a defendant's statement of sympathy as evidence in a medical liability action." H.B. 215, as reported by H. Insurance (Ohio 2004). As the bill was passed by both the House and Senate, the synopsis explained that it would "prohibit[ ] the use of any statement of sympathy offered by a health care provider * * * as evidence of an admission of liability or an admission against interest[.]    * * *    For this purpose, a statement of sympathy includes any and all statements, affirmations, gestures, or conduct expressing apology, sympathy, commiseration, condolence, compassion, or a general sense of benevolence[.]" H.B. 215.

This explanation, which never changed as the bill traveled through the House and Senate, indicates that the intent was to forbid the use at trial of a medical professional's expression of "sympathy includ[ing] any and all statements expressing apology." 2004 Sub. H.B. No. 215. The General Assembly's decision to define "a statement of sympathy" as including a "statement[ ] * * * expressing apology" demonstrates an intention to use the word "apology" to mean only a statement of condolence or sympathy, without including any expression of fault or liability. Further, if the General Assembly had intended to prohibit the use of all statements of fault uttered by medical professionals to injured patients or their families, it could have done so by writing that all "admissions of liability" or "statements against interest" would be excluded, rather than limiting its description of the prohibited statements to those "expressing apology, sympathy, commiseration, condolence, compassion, or a general sense of benevolence." R.C. 2317.43(A).

*Id.* at ¶ 11-12. The Ninth District, therefore, concluded "the intent was to protect pure expressions of apology, sympathy, commiseration, condolence, compassion, or a general sense of benevolence, but not admissions of fault." *Id.* at ¶ 13. The court held that a surgeon's statement to a patient's husband and daughter that he had "nicked an artery and * * * took full responsibility for it" was admissible evidence at trial. *Id.* at ¶ 14-15.

{¶ 47} While we agree with the Ninth District's conclusion that R.C. 2317.43 is ambiguous, we find that the intent of the statute is to exclude from evidence *all* statements of apology—including those statements admitting fault. Although statements of fault are not explicitly mentioned in the apology statute, "an admission of error is included in some

definitions of apology." *Lawrence v. MountainStar Healthcare*, 320 P.3d 1037, 1049 (Utah Ct.App.2014). For instance, Webster's Third New International Dictionary 101 (1993) defines "apology" as:

> 1. something said or written in defense or justification of what appears to others to be wrong * * *; 2. an attempt to justify or excuse; 3. *an acknowledgement intended as an atonement for some improper or injurious remark or act: an admission to another of a wrong or discourtesy done him accompanied by an expression of regret*; [or] 4. Something that serves as an excuse for the absence of something * * *.

(Emphasis added.) "Apology," therefore, may or may not include an admission of fault. *See Lawrence* at 1049; *Davis*, 2011-Ohio-3199 at ¶ 10. Thus, looking to the rules of grammar and common usage, we agree with the *Davis* court that the term "apology" in R.C. 2317.43(A) is ambiguous. *See id.*

**{¶ 48}** As R.C. 2317.43(A) is ambiguous and capable of more than one reasonable interpretation, we must interpret the statute to determine the General Assembly's intent. *See Sherwin-Williams Co.*, 2006-Ohio-6498 at ¶ 15. In looking at the object sought to be obtained by the statute, the Ohio Supreme Court has recognized that the purpose behind the apology statute is to provide "opportunities for healthcare providers to apologize and console victims of unanticipated outcomes of medical care without fear that their statements will be used against them in a malpractice suit, by making the statements inadmissible as evidence of admission of liability or a statement against interest." *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, ¶ 1. Further, the statute's legislative history indicates that the statute was enacted to "[p]rohibit the use of a defendant's statement of sympathy as evidence in a medical liability action." Sub.H.B. No. 215, 150 Ohio Laws, Part III, 4146.

**{¶ 49}** The legislature chose to include the word "apology" in the statute with knowledge of its general usage. Included within the word's general usage is that an apology

includes "an admission to another of a wrong or discourtesy done him accompanied by an expression of regret." Webster's at 101. As R.C. 2317.43(A) specifically provides that "*any and all*" statements of apology are inadmissible as evidence of admission of liability or as evidence of an admission of guilty, we conclude that the legislature intended to exclude statements of fault from evidence under the apology statute. Had the General Assembly intended to exclude statements of fault from being encompassed in the statute, it could have done so by expressly stating so in the statute. *See, e.g.,* La.Rev.State.Ann. 13:3715.5 ("Any communication * * * expressing * * * apology, regret, grief, sympathy, commiseration, condolence, compassion, or a general sense of benevolence * * * shall not be admissible[.] * * * A statement of fault, however, which is part of, or in addition to, any such communication shall not be made inadmissible pursuant to this Section"); Neb.Rev.Stat.Ann. 27-1201(1) ("In any civil action brought by an alleged victim of an unanticipated outcome of medical care, * * * any and all statements * * * expressing apology, sympathy, commiseration, condolence, compassion, or a general sense of benevolence * * * shall be inadmissible as evidence of an admission of liability or as evidence of an admission against interest. A statement of fault which is otherwise admissible and is part of or in addition to any such communication shall be admissible").

{¶ 50} Therefore, given the language and stated intent of the apology statute, we conclude that statements of fault are inadmissible under the apology statute. Dr. Vivian's ICU statements that "he didn't know how it happened; it was a terrible situation, but she had just told him that she still wanted to be dead, that she wanted to kill herself" were properly excluded from evidence pursuant to Ohio's apology statute.

{¶ 51} Stewart's first assignment of error is overruled.

## B. Medical Director Evidence

{¶ 52} Assignment of Error No. 2:

- 22 -

{¶ 53} THE COURT ERRED IN EXCLUDING TESTIMONY AND EXHIBITS REGARDING DR. VIVIAN'S ROLE AS MEDICAL DIRECTOR OF THE PSYCHIATRIC UNIT WHERE MICHELLE STEWART COMMITTED SUICIDE.

{¶ 54}  In his second assignment of error, Stewart argues the trial court erred when it granted Dr. Vivian's motion in limine to exclude evidence of his status as Mercy's medical director.  Stewart contends exclusion of this evidence was improper and prejudicial to his malpractice claim and should result in a new trial being ordered.

{¶ 55}  It was uncontroverted that Dr. Vivian was the medical director of Mercy's behavioral health department at the time Michelle was admitted to the hospital in February 2010.  The parties disputed, however, whether his role as medical director was relevant to Stewart's malpractice claim against Dr. Vivian.  Dr. Vivian filed a motion in limine to exclude this evidence from being admitted at trial.  After considering the merits of Dr. Vivian's motion, the trial court concluded testimony regarding Dr. Vivian's duties as medical director and exhibits related to his role as medical director were inadmissible except for impeachment purposes.  The exhibits and testimony that were excluded from evidence, over Stewart's objections at trial, related to (1) Dr. Vivian's independent contractor status with the hospital, (2) his duties as medical director, including his responsibilities to review, assess, modify, implement, educate, and train on policies, procedures, and forms used in the psychiatric unit, (3) licensure and accreditation of the psychiatric unit, which included addressing departmental deficiencies with the hospital environment and corrective actions taken to address prior suicide attempts on the unit, (4) patient observation methods and policies, (5) identification of safety hazards in patients' rooms, (6) the hospital's response to Michelle's suicide, and (7) the termination of Dr. Vivian's relationship with the hospital.

{¶ 56}  The trial court excluded evidence of Dr. Vivian's medical director status after finding that the evidence did not make it "more or less likely that he was negligent in his care

of Michelle." The court also concluded that because Mercy was not a party at trial, the medical director evidence was not relevant to Stewart's claim that the hospital was vicariously liable for Dr. Vivian's actions. Further, the trial court found that although Dr. Vivian had a right to control other hospital employees providing care to Michelle, he could not be found vicariously liable as these individuals were not his employees. The trial court stated that "[t]he mere 'right to control' is not sufficient to establish vicarious liability on the part of a borrowing employer under the loaned-servant doctrine."

{¶ 57} Stewart argues the trial court's decision to exclude the medical director evidence was erroneous as (1) Dr. Vivian's personal liability for the "substandard care" he provided to Michelle arose "out of both his role as her treating physician and his role as * * * [m]edical [d]irector;" (2) Mercy's settlement and Dr. Vivian's election to receive a setoff of the settlement rather than an apportionment by the jury supported the admission of the medical director evidence; (3) exclusion of the evidence allowed Mercy's staff members to offer improper lay testimony regarding Dr. Vivian's standard of care; and (4) Dr. Vivian's liability as medical director was not released by the settlement agreement Stewart reached with Mercy hospital.

{¶ 58} Prior to addressing Stewart's arguments, we note that a trial court's decision to admit or exclude evidence at trial is reviewed under an abuse-of-discretion standard. *Beard*, 2005-Ohio-4787 at ¶ 20; *Ohmer v. Renn-Ohmer*, 12th Dist. Butler No. CA2012-02-020, 2013-Ohio-330, ¶ 17. "[A] reviewing court [will] not disturb evidentiary decisions in the absence of an abuse of discretion that created a material prejudice." *Schneble v. Stark*, 12th District Warren Nos. CA2011-06-063 and CA2011-06-064, 2012-Ohio-3130, ¶ 30. An abuse of discretion is more than an error of law or judgment; it requires a finding that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

1. Dr. Vivian's Dual Role as Treating Physician and Medical Director

**{¶ 59}** Stewart contends exclusion of the medical director evidence prevented him from "establish[ing] that Dr. Vivian himself violated the standard of care with respect to his own contractual responsibilities as [m]edical [d]irector." According to Stewart, as medical director, Dr. Vivian was responsible for correcting and implementing measures to ensure a safe environment for psychiatric patients, for evaluating, understanding, and educating Mercy's staff regarding the use of suicide risk assessment forms, and for reviewing, modifying, and implementing policies regarding the different levels of observation and monitoring for patients. In support of his argument that Dr. Vivian could be held liable to Michelle and her family for failing to meet his contractual responsibilities as medical director, Stewart relies on *Lownsbury v. VanBuren*, 94 Ohio St.3d 231 (2002).

**{¶ 60}** In *Lownsbury*, the Supreme Court held that "[a] physician-patient relationship can be established between a physician who contracts, agrees, undertakes, or otherwise assumes the obligation to provide resident supervision at a teaching hospital and a hospital patient with whom the physician had no direct or indirect contact." *Id.* at syllabus. There, a physician, Dr. Stover, entered into an agreement with Akron City Hospital to supervise treating obstetric residents. *Id.* at ¶ 233-234. Lownsbury, a pregnant patient, was admitted to the hospital's labor and delivery unit for an induction of labor. *Id.* at 232. However, rather than inducing labor, the residents administered a contraction stress test and discharged Lownsbury after improperly determining that her baby was not under distress. *Id.* The baby was born with permanent brain damage five days later. *Id.* at 233. The child's adoptive parents brought suit against Dr. Stover, arguing that he had assumed the duty to provide Lownsbury with supervisory care by contracting to serve as the on-premises attending and supervising obstetrician. *Id.*

**{¶ 61}** Dr. Stover moved for summary judgment on the ground that he owned no legal

- 25 -

duty of supervision to Lownsbury or her baby because he and Lownsbury never had a physician-patient relationship. *Id.* The trial court granted Dr. Stover's motion, and the Ninth District Court of Appeals affirmed the trial court's decision. The Supreme Court reversed, concluding that a genuine issue of material fact existed as to whether a physician-patient relationship existed between Dr. Stover and Lownsbury. *Id.* at 243. In reversing, the Supreme Court stated the following:

> The basic underlying concept in these cases is that a physician-patient relationship, and thus a duty of care, may arise from whatever circumstances evince the physician's consent to act for the patient's medical benefit. The physician-patient relationship being consensual in nature, these courts recognize that physicians who practice in the institutional environment may be found to have voluntarily assumed a duty of supervisory care pursuant to their contractual and employment arrangements with the hospital. Unlike the traditional personalized delivery of health care, where the patient seeks out and obtains the services of a particular physician, the institutional environment of large teaching hospitals incorporates a myriad of complex and attenuated relationships. Here, the presenting patient enters a realm of full-service coordinated care in which technical agreements and affiliations proliferate the specialized functions and designated obligations of various allied health professionals. In this reality, the responsibility for resident supervision that rests generally with the hospital is often delegated to or assumed by an individual physician or group of physicians. It is their level of skill and competence that ensures adequate patient care. When a patient enters this setting, he or she has every right to expect that the hospital and adjunct physicians will exercise reasonable care in fulfilling their respective assignments. So it is a logical and reasonable application of the principles set forth in *Tracey* [*v. Merrell Dow Pharmaceuticals, Inc.*], 58 Ohio St.3d 147 * * * [1991], to find that a physician may agree in advance to the creation of a physician-patient relationship with the hospital's patients.

*Id.* at 238-239.

{¶ 62} Although Stewart urges this court to extend the rationale of *Lownsbury* to the facts of the present case, we decline to do so for two reasons. First, under the facts of the present case, there is no dispute as to whether Dr. Vivian was in a physician-patient

- 26 -

relationship with Michelle. Dr. Vivian was Michelle's treating physician, and he had direct contact with her in this capacity.

{¶ 63} Second, we find that the holding in *Lownsbury* is limited to those circumstances involving a supervisory physician who is responsible for residents providing care in an institutional environment or who undertakes specific duties to supervise residents in a teaching hospital. *See e.g., Everhart v. Coshocton Cty. Mem. Hosp.*, 10th Dist. Franklin No. 12AP-75, 2013-Ohio-2210, ¶ 43-57 (finding *Lownsbury* is limited to circumstances involving teaching hospitals); *Bergenstein v. Sawhny*, N.D.Ohio No. 1:04 CV 1373, 2006 WL 5249728, *2 (July 19, 2006) (holding that "there is no suggestion * * * that *Lownsbury* extends beyond teaching hospitals"). In the present case, there is no suggestion that Mercy is a teaching hospital or that Dr. Vivian was responsible for supervising the work of residents. *Lownsbury*, therefore, has no application to the present case.

{¶ 64} Further, although Stewart maintains that Dr. Vivian should be held liable for failing to meet his contractual responsibilities as medical director, we note that Stewart's complaint does not set forth such a claim. The preamble of the complaint notes that Dr. Vivian is in charge of Mercy's psychiatric unit, but nowhere in the complaint is Dr. Vivian identified as the "medical director." Additionally, the complaint does not set forth Dr. Vivian's contractual duties as medical director or allege that Dr. Vivian breached these duties in his care of Michelle. Rather, Stewart's complaint sets forth a medical malpractice claim alleging Dr. Vivian failed to observe the applicable standard of care in assessing, diagnosing, and treating Michelle. The issue raised by Stewart, therefore, was whether Dr. Vivian's treatment, assessment, and care of Michelle satisfied the standard of care. The medical director evidence did not have any bearing on this issue. As the jury determined the standard of care was satisfied, the lack of proper policies, training of staff, or assessment tools could not provide separate liability on Dr. Vivian. On the other hand, if the jury had determined the

standard of care was not satisfied, the existence of proper policies, training of staff, and assessment tools would not have negated Dr. Vivian's liability for malpractice. For this reason, we find no error in the exclusion of the medical director evidence.

2. Dr. Vivian's Election to Receive a Setoff

{¶ 65} Stewart also contends that exclusion of the medical director evidence was improper as it resulted in a "double setoff." Essentially, Stewart argues that by excluding the medical director evidence, Dr. Vivian received the benefit of prohibiting the jury from finding him liable for failing to meet his contractual duties as medical director and the benefit of a setoff under R.C. 2307.28 for the amount of the hospital's settlement.[9] Stewart argues, "[t]he [m]edical [d]irector evidence is relevant to both the claim against the hospital and the claim against Dr. Vivian. * * * [T]he fact that the hospital may be liable based on its responsibility for Dr. Vivian's actions as [m]edical [d]irector, does not negate the fact that Dr. Vivian is also liable in his own right."

{¶ 66} We find no merit to Stewart's argument. The fact that Dr. Vivian may have

---

9. {¶ a} R.C. 2307.28 provides:

{¶ b} When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons for the same injury or loss to person or property or the same wrongful death, both of the following apply:

{¶ c} (A) The release or covenant does not discharge any of the other tortfeasors from liability for the injury, loss, or wrongful death unless its terms otherwise provide, but it reduces the claim against the other tortfeasors to the extent of the greater of any amount stipulated by the release or the covenant or the amount of the consideration paid for it, except that the reduction of the claim against the other tortfeasors shall not apply in any case in which the reduction results in the plaintiff recovering less than the total amount of the plaintiff's compensatory damages awarded by the trier of fact and except that in any case in which the reduction does not apply the plaintiff shall not recover more than the total amount of the plaintiff's compensatory damages awarded by the trier of fact.

{¶ d} (B) The release or covenant discharges the person to whom it is given from all liability for contribution to any other tortfeasor.

been permitted a setoff is of no consequence to the trial court's decision to exclude evidence of Dr. Vivian's role as medical director.[10] Again, the issue raised by Stewart was whether Dr. Vivian was negligent in his treatment, assessment, and care of Michelle. In attempting to prove his claim, Stewart was permitted to present evidence that Dr. Vivian had knowledge of the environmental hazards in Michelle's room. The trial court allowed Stewart to question Dr. Vivian about the environmental hazards and whether Dr. Vivian took the hazards into account in his treatment of Michelle. Although Stewart was prohibited from demonstrating Dr. Vivian's knowledge of the hazards developed out of his role as medical director, the fact that Dr. Vivian was aware of the hazards was an issue properly presented to the jury. Exclusion of the medical director evidence was, therefore, proper.

### 3.    Improper Lay Testimony

{¶ 67}    Stewart also argues that exclusion of the medical director evidence was improper as it "distorted Dr. Vivian's relationship with the staff" and allowed the staff to offer

---

10.  {¶ a}    We note that given the jury verdict in favor of Dr. Vivian, the trial court did not reach a determination as to whether there would be a setoff under R.C. 2307.28. Prior to the verdict being rendered, the trial court issued a preliminary ruling stating that it did not intend to rule on whether Dr. Vivian was entitled to a setoff until after trial. Specifically, the court stated:

{¶ b}    [I]t seems to me the issue of a set off [sic] is not really ripe until there is a judgment and then it becomes a post-trial matter. And if there is a disagreement as to whether Mercy is a tortfeasor it seems to me that essentially we have a motion hearing and - - because I assume that their [Mercy's] release may say something along the lines that - - I don't know if either of you have seen their settlement agreement, but I assume it may say something along the lines that we're agreeing to pay so much money, but we're not agreeing that we were in any way responsible. * * *

{¶ c}    * * *

{¶ d}    So then if you're not admitting that they were a tortfeasor then it seems to me there has to be some way for the Court to determine at that point whether they're a tortfeasor or they're not a party to this action. Party to the action in terms of trial. * * *

{¶ e}    * * *

{¶ f}    Okay. * * * We'll - - we'll cross that when we get to it.

"lay testimony regarding Dr. Vivian's standard of care." Stewart contends that "[t]he excluded evidence clearly would have established that Dr. Vivian was not a member of the [t]eam—he was the head of it, and as such had the responsibility for reviewing and establishing all of the procedures and policies regarding patient care and observation." According to Stewart, "the exclusion of the medical director evidence prevented the jury from understanding that the whole team got it wrong because the director and head of the team, Dr. Vivian failed in his duty."

{¶ 68} The record reveals Dr. Vivian's status as the "head" of the team was an issue flushed out at trial. On numerous occasions, Stewart elicited responses from Mercy's staff that Dr. Vivian was in charge, or the head, of the medical team. Mercy's staff members all testified that Dr. Vivian, as the treating physician, had the final say about the level of observation under which Michelle should be placed and whether she should receive pharmaceutical treatment for her agitation. The fact that Dr. Vivian was in control of Michelle's treatment and care was apparent and did not require reference to Dr. Vivian's status as medical director.

{¶ 69} Further, there is no merit to Stewart's argument that exclusion of the medical director evidence prevented him from proving the "whole team got it wrong" in their treatment of Michelle. Stewart did not proceed on claims against the "whole team" at trial as his claims alleging negligence on behalf of Mercy and its staff had been settled. Stewart also never set forth a cause of action seeking to hold any specific "team" member personally liable for his or her treatment of Michelle, and he did not proceed at trial on a claim that Dr. Vivian negligently supervised Mercy's staff.[11] Exclusion of the medical director testimony was not, therefore, an abuse of the trial court's discretion.

---

11. *See* our resolution of Stewart's third assignment of error for further discussion about a negligent supervision claim.

4. Settlement Agreement with Mercy

**{¶ 70}** In his final argument under the second assignment of error, Stewart contends exclusion of the medical director evidence was improper as "Dr. Vivian's liability as medical director was not released by the settlement agreement with the hospital." Essentially, Stewart contends the settlement agreement did not release his claims against Dr. Vivian because Dr. Vivian was not an "officer, director, employee, agent, or shareholder" of Mercy hospital at the time the agreement was entered.

**{¶ 71}** We begin our analysis by noting that the trial court had not been provided with a copy of the settlement agreement prior to ruling on Dr. Vivian's motion in limine to exclude evidence of his status as medical director. Although the court was aware of the existence of the agreement, the terms of the agreement had not been disclosed. The court, therefore, did not rely on the express terms of the settlement agreement in holding the medical director evidence inadmissible at trial.

**{¶ 72}** The first time the court viewed the settlement agreement was *after* the trial concluded and *after* Stewart filed his motion for judgment notwithstanding the verdict or motion for new trial. The court conducted a post-trial in camera review of the settlement agreement before denying Stewart's motion, stating that the settlement agreement "*gives further support* to the finding that the medical director evidence and testimony was properly excluded." (Emphasis added.)

**{¶ 73}** As the settlement agreement was not available to the trial court at the time it ruled the medical director evidence inadmissible, we find that the court's later interpretation of the agreement—erroneous or not—is of no consequence to our determination of whether the evidence was properly excluded at trial. Looking at the arguments and evidence presented to the trial court at the time the court ruled the evidence inadmissible, we find no error in the court's decision to exclude the evidence on the basis that Dr. Vivian's status as medical

director did not make it more or less likely that he was negligent in his care of Michelle. The trial court, therefore, did not abuse its discretion in excluding the evidence from trial.

{¶ 74} The trial court's interpretation of the settlement agreement is of relevance, however, to the denial of Stewart's motion for new trial. The court concluded that the exclusion of the medical director evidence did not provide grounds for a new trial under Civ.R. 59(A).[12] After examining the settlement agreement, the court concluded that the agreement "manifests an intention to release the claims against anyone in their capacity as director or employee of Mercy Hospital. The only claim that remained for trial was the medical malpractice claim against Dr. Vivian in his individual capacity."

{¶ 75} "It is axiomatic that a settlement agreement is a contract designed to terminate a claim by preventing or ending litigation and that such agreements are valid and enforceable by either party." *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.,* 74 Ohio St.3d 501, 502 (1996). The construction of a written contract is a question of law, which we review de novo. *In re All Kelly & Ferraro Asbestos Cases,* 104 Ohio St.3d 605, 2004-Ohio-7104, ¶ 28. "In construing the terms of a written contract, the primary objective is to give effect to the intent of the parties, which we presume rests in the language that they have chosen to employ." *Id.* at ¶ 29. Where the terms of the contract are clear and unambiguous, a court need not go beyond the plain language of the agreement to determine

---

12. {¶ a} Civ.R. 59(A) provides that a court may grant a new trial for "good cause shown." Further, "[a] new trial may be granted * * * on all or part of the issues upon any of the following grounds:

> {¶ b} (1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;
>
> {¶ c} * * *
>
> {¶ d} (9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application.

Civ.R. 59(A)(1) and (9).

the rights and obligations of the parties. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.,* 46 Ohio St.3d 51, 53 (1989). Additionally, "[w]here possible, a court must construe the agreement to give effect to every provision in the agreement." *In re All Kelly & Ferraro Asbestos Cases* at ¶ 29.

**{¶ 76}** Having reviewed the settlement agreement entered into by Stewart and Mercy hospital, we find that the agreement did not release any of Stewart's claims against Dr. Vivian. The agreement released Mercy hospital and "its respective officers, directors, employees, agents, and shareholders * * * of and from any and all claims* * * related to all claims, for personal injury, wrongful death or otherwise, as more fully described and set forth in the matter of *Stewart v. Vivian et al.*, Clermont County Court of Common Pleas, Case Number 2011 CVA 00318." As Dr. Vivian was not an officer, director, employee, agent, or shareholder of Mercy at the time the agreement was entered into, the claims against him were not released. *See, e.g., Aztec Internatl. Foods, Inc. v. Duenas*, 12th Dist. Clermont No. CA2012-01-002, 2013-Ohio-450, ¶ 61-67 (finding that claims against a former shareholder and officer of a company were not released by a settlement agreement as the former shareholder and officer had terminated his relationship prior to the settlement agreement being reached). Furthermore, the release specifically provided that "*Stewart v. Vivian et al.*, Clermont County Court of Common Pleas, Case Number 2011 CVA 00318, *shall remain pending against Rodney Vivian, M.D. as he is not a released party under this release.*" (Emphasis added).

**{¶ 77}** However, even though the settlement agreement did not release Stewart's claims against Dr. Vivian, we find no error in the trial court's decision to deny a new trial on the basis that the medical director evidence had been excluded from trial. The trial court did not rely solely on its interpretation of the settlement agreement in determining that the medical director evidence had been properly excluded from evidence. Rather the court

stated that the agreement gave "*further support* to the finding that the medical director evidence and testimony was properly excluded." (Emphasis added.) The primary reason the trial court did not admit evidence of Dr. Vivian's status as medical director was because this evidence did not make it more or less likely that Dr. Vivian was negligent in his care of Michelle. As discussed above, Stewart's complaint did not set forth Dr. Vivian's contractual duties as medical director or allege that Dr. Vivian breached these duties in his treatment of Michelle. Rather, Stewart's complaint raised issues pertaining to whether Dr. Vivian observed the applicable standard of care in his assessment, treatment, and care of Michelle. To the extent that there were environmental concerns or hazards affecting Dr. Vivian's treatment and care of Michelle, the court properly permitted questioning about these concerns without reference being made to Dr. Vivian's role as medical director. We, therefore, conclude that the trial court's interpretation of the settlement agreement, although erroneous, was harmless.

{¶ 78} Accordingly, for the reasons set forth above, we conclude that the trial court did not abuse its discretion in excluding testimony and evidence of Dr. Vivian's role as medical director. Stewart's second assignment of error is overruled.

### C. Jury Instruction

{¶ 79} Assignment of Error No. 3:

{¶ 80} THE COURT ERRED IN INSTRUCTING THE JURY THAT DR. VIVIAN WAS "NOT LEGALLY RESPONSIBLE FOR THE ACTIONS OF CLERMONT MERCY HOSPITAL OR ANY OF ITS EMPLOYEES."

{¶ 81} In his third assignment of error, Stewart argues the trial court erred in advising the jury as follows:

> There is no claim before you that Clermont Mercy Hospital or any
> of its employees or agents were negligent or that any negligence
> on the part of Clermont Mercy Hospital or any of its agents or

employees caused the injury or death of Michelle Stewart. You may not consider or speculate as to such matters which are not before you for consideration.

*Additionally, Dr. Vivian is not legally responsible for the actions of Clermont Mercy Hospital or any of its employees or agents including but not limited to nurses, medical technicians, and social workers.* If you find that the Defendant, Dr. Vivian, was negligent and that his negligence proximately caused Michelle Stewart's injury and death, then your verdict must be for the Plaintiff on both the survival claim and on the wrongful death claim.

(Emphasis added.)

**{¶ 82}** At trial, Stewart objected to the foregoing instruction, arguing that the italicized sentence invited the jury to speculate about the hospital's actions. Stewart contended inclusion of this sentence would confuse the jury. The trial court disagreed and gave the instruction after stating the following:

What it is, is saying - - we're - - we're not going to make any finding here as to what percentage of liability the hospital might have. That's not your job, you're not - - no - - there's no claim in this trial for negligence by the hospital. And when you're assessing Dr. Vivian's negligence, you can't look to what that - - what the employees of the hospital did, which is I think are [sic] saying two different things. * * *

**{¶ 83}** Stewart now argues that the instruction "conflicted with * * * prior language [in the instruction], such that the jury was prejudicially confused." He also argues that the instruction is an inaccurate statement of the law as "Dr. Vivian could be held legally responsible for the actions of * * * Mercy staff or employees, when those actions are a result of his negligent supervision or direction."

**{¶ 84}** "When considering the appropriateness of a jury instruction, or when a specific jury instruction is in dispute, a reviewing court must examine the instructions as a whole." *A.N. Bros. Corp. v. Total Quality Logistics, L.L.C.*, 12th Dist. Clermont No. CA2015-02-021, 2016-Ohio-549, ¶ 59, citing *Enderle v. Zettler*, 12th Dist. Butler No. CA2005-11-484, 2006-

Ohio-4326, ¶ 36. *See also Sech v. Rogers*, 6 Ohio St.3d 462, 464 (1983) ("A jury instruction must be considered in its entirety and, ordinarily, reversible error does not consist of misstatements or ambiguity in a part of the instruction"). The court "must determine whether the jury charge probably mislead the jury in a matter materially affecting the complaining party's substantial rights." *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208 (1990). "If, taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled." *Withers v. Mercy Hosp. of Fairfield*, 12th Dist. Butler No. CA2010-02-033, 2010-Ohio-6431, ¶ 17. Further, unnecessary, ambiguous, or even affirmatively erroneous portions of a jury charge do not inevitably constitute reversible error. *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 35.

{¶ 85} Looking at the jury instructions as a whole, we find no error in the trial court's decision to include the statement that "Dr. Vivian is not legally responsible for the actions of Clermont Mercy Hospital or any of its employees or agents including but not limited to nurses, medical technicians, and social workers." The jury was properly instructed that it could not consider Mercy's negligence. Including further instruction that Dr. Vivian could not be liable for Mercy's employees' actions was appropriate and did not create the danger of misleading the jury. As Stewart acknowledged in his appellate brief, he "is not claiming, and has NEVER claimed, that Dr. Vivian is vicariously responsible for the independent negligence of the hospital staff." The court's instruction merely reiterated that Dr. Vivian could only be found liable for his own acts or omissions, and not the acts or omissions of Mercy's staff.

{¶ 86} Further, with respect to Stewart's claim that the instruction was improper given that Dr. Vivian could have been found liable for his negligent supervision of Mercy's staff, we note that Stewart never requested such an instruction. Stewart also never objected to the following instruction given by the trial court:

The Plaintiff's claims are that the Defendant, as the Plaintiff's treating psychiatrist, failed to reasonably protect Michelle Stewart from self-harm, by failing to comply with the applicable standard of care with respect to the following: 1) His assessment of Michelle Stewart's depression and other mood disorders; 2) His assessment of Michelle's [sic] Stewart's risk for self-harm; 3) The level of observation of Michelle Stewart ordered by him; and 4) His treatment of Michelle Stewart.

{¶ 87} Accordingly, as Stewart admitted that Dr. Vivian could not be held vicariously liable for the hospital staff's independent negligence and he never requested an instruction regarding Dr. Vivian's alleged negligent supervision of Mercy's staff, we find no error in the trial court's jury instruction. Stewart has failed to demonstrate that the trial court gave an erroneous jury instruction materially affecting his rights. *See, e.g., Hayward v. Summa Health Sys./Akron City Hosp.*, 139 Ohio St.3d 238, 2014-Ohio-1913.

{¶ 88} Stewart's third assignment of error is, therefore, overruled.

### D. Manifest Weight of the Evidence

{¶ 89} Assignment of Error No. 4:

{¶ 90} THE COURT ERRED IN FINDING THAT THE MANIFEST WEIGHT OF THE EVIDENCE FAVORED DEFENDANT.

{¶ 91} In his fourth assignment of error, Stewart argues the jury's decision in favor of Dr. Vivian on the malpractice claim was against the manifest weight of the evidence. Stewart contends the evidence presented at trial overwhelmingly demonstrated that Dr. Vivian should have elevated the level of observation Michelle was placed under and he should have taken further precautions to ensure Michelle's safety.

{¶ 92} When evaluating whether a judgment is against the manifest weight of the evidence in a civil case, the standard of review is the same as in the criminal context. *Duenas*, 2013-Ohio-450 at ¶ 35, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17. "[W]e weigh the evidence and all reasonable inferences, consider the credibility

of witnesses, and determine whether in resolving conflicts in the evidence, the finder of fact 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Marinich v. Lumpkin*, 12th Dist. Warren No. CA2011-11-124, 2012-Ohio-4526, ¶ 20, quoting *Eastley* at ¶ 20. In weighing the evidence, we are mindful of the presumption in favor of the finder of fact. *Eastley* at ¶ 21. "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court." *Seasons Coal Co., Inc.* v. *Cleveland*, 10 Ohio St.3d 77, 81 (1984). After all, the jury, as the trier of fact, is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Cropper v. Jewell*, 12th Dist. Clermont No. CA2008-09-088, 2009-Ohio-3683, ¶ 16, citing *Seasons Coal* at 80. In order to reverse a jury verdict on the weight of the evidence, a court of appeals panel must act unanimously. *Purcell v. Schaefer*, 12th Dist. Preble No. CA2013-09-007, 2014-Ohio-4894, ¶ 8, citing *Eastley* at ¶ 7.

{¶ 93} To establish a claim of medical malpractice, a plaintiff must prove by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician of ordinary skill, care, and diligence would not have done under like or similar conditions, or was caused by the failure or omission to do some particular thing or things that such a physician would have done under like or similar conditions, and that the injury complained of was the direct and proximate result of the physician's doing or failing to do such particular thing or things. *Bruni v. Tatsumi*, 46 Ohio St.2d 127 (1976), paragraph one of the syllabus; *Taylor v. McCullough-Hyde Mem. Hosp.*, 116 Ohio App.3d 595, 599 (12th Dist.).

{¶ 94} Stewart argues the majority of evidence presented at trial demonstrates Dr. Vivian fell below the standard of care in his assessment, care, and treatment of Michelle.

Stewart relies on his experts' testimony to establish that Dr. Vivian did not act as other psychiatrists would have under similar circumstances in conducting an assessment of Michelle or in placing her on 15-minute checks. Stewart contends the evidence presented at trial demonstrates Dr. Vivian did not obtain an accurate assessment of Michelle's suicidality, and that by choosing not to obtain collateral information about Michelle's history and behavior from her family members, Dr. Vivian fell below the standard of care. However, while the jury heard testimony from Stewart's experts that Dr. Vivian should have obtained collateral information from Michelle's family and friends, the jury also heard testimony from defense experts that Dr. Vivian's assessment met the standard of care. Dr. Correll testified that attempting to obtain collateral information from a patient's family members can hurt the physician-patient relationship. Dr. Songer agreed and testified that he might not have spoken with Michelle's family either. The jury was entitled to find Dr. Vivian's experts' testimony more credible, especially in light of Dr. Vivian's testimony that he did not speak with Michelle's family members because she did not give him permission and he did not want to risk alienating Michelle.

{¶ 95} The jury also heard conflicting expert testimony regarding the level of observation placed on Michelle. Dr. Beckson and Dr. Palumbo both felt Michelle should have been placed on a higher level of observation, consisting of either one-to-one observation or constant supervision, given her agitation, her statement to the Mt. Orab physician that she had a continued desire to kill herself, and her statements to Wiggs that she was suicidal, was upset to be found breathing, had been researching suicide for 25 years, and had "lots of plans." However, Dr. Vivian was aware of these factors and nonetheless believed Michelle was not actively suicidal and that 15-minute checks were an appropriate level of observation. Dr. Correll and Dr. Songer both agreed, opining that they saw no reason to believe Michelle posed an imminent, active risk of suicide until she actually committed the act of hanging

herself. Dr. Correll discussed the existence of numerous protective factors indicating that Michelle would be able to overcome her suicidal thoughts, including her long-term employment, her recent marriage, and her future plans to complete college and become pregnant. Given the evidence presented, the jury was entitled to find that 15-minute checks were an appropriate level of observation. The jury was in the best position to judge the credibility of this contradictory evidence, and we will not reverse a jury's decision merely because there was some contrary evidence presented. *See Underwood v. Boeppler*, 12th Dist. Butler No. CA2014-02-055, 2015-Ohio-156, ¶ 23.

**{¶ 96}** Stewart also argues the weight of the evidence demonstrates Dr. Vivian's treatment of Michelle fell below the applicable standard of care when he placed her in an environment that provided the opportunity for suicide. Evidence presented at trial demonstrated Dr. Vivian placed Michelle in her hospital room on 15-minute checks with knowledge that a prior patient had attempted to hang himself in one of the psychiatric unit's rooms. Evidence was also presented that Dr. Vivian was aware of the environmental dangers that existed in Mercy's psychiatric unit rooms, including the hazards posed by the weight-bearing door handles and the straight-edge tops of the bathroom doors. Although one of Stewart's experts believed putting Michelle in her hospital room on 15-minute checks was akin to putting her "in a closed-door room with a loaded gun," there was evidence from Dr. Vivian's experts that placing Michelle in her own room on 15-minute checks was appropriate. Dr. Songer testified a psychiatrist should view any known risks or hazards in the larger context of treatment and that questions regarding environmental risks are moot if the treating physician has concluded the patient does not pose an active risk of suicide. Dr. Vivian testified he did not believe Michelle was actively suicidal. He also testified he had weighed the safety concerns as well as the need to provide care to Michelle within the least-restrictive environment before determining that 15-minute checks were appropriate. The jury

was entitled to give more weight to the evidence and testimony presented by the defense and conclude that 15-minute checks on Michelle in her hospital room were appropriate.

{¶ 97} Stewart further contends the weight of the evidence demonstrates Dr. Vivian *knew* Michelle had plans to kill herself on the unit, and yet he neglected to raise the level of observation to ensure her safety. Dr. Vivian's testimony at trial, however, was that it was "possible" that Michelle told him she planned to kill herself in the hospital and that he did not put it in his written records. Dr. Vivian did not think this had occurred, but was willing to agree with Stewart's counsel that "it's possible." The jury was entitled to give as little or as much weight to this testimony as it chose. *See Boeppler*, 2015-Ohio-156 at ¶ 19 ("the jury is free to believe, all, part, or none of the testimony of the witnesses which appeared before it"). The jury could have determined from Dr. Vivian's testimony that it was more likely than not that Michelle never made any statement to Dr. Vivian that she intended to kill herself in the hospital. Dr. Vivian's alleged "actual knowledge," therefore, does not support a finding that the verdict was against the manifest weight of the evidence.

{¶ 98} Finally, Stewart argues that judgment in favor of Dr. Vivian was improper as "Dr. Vivian made his treatment decisions based upon [the] blatantly wrong perception of the efficacy of 15-minute checks, which falls below the standard of care." At trial, all the experts testified Dr. Vivian's original premise that patients cannot kill themselves while on 15-minute checks was incorrect. Stewart's experts believed that treating patients under this mistaken premise was further evidence that Dr. Vivian's treatment of Michelle fell below the applicable standard of care. Dr. Vivian's experts, however, did not agree.

{¶ 99} While Dr. Correll explained that a reasonable psychiatrist would not believe Dr. Vivian's mistaken premise because "[p]atients have killed themselves on every level of observation in the history of psychiatry," he never opined that Dr. Vivian's treatment fell below the standard of care. In fact, after considering Dr. Vivian's mistaken premise about 15-

minute checks, Dr. Correll stated he believed that "with the information at hand [Dr. Vivian] acted according to what most psychiatrists would have done and per the standard of care on that day." Similarly, Dr. Songer agreed that the assumption that a patient could not commit suicide while on 15-minute checks was incorrect, but he never testified that Dr. Vivian or his treatment of Michelle fell below the standard of care. Therefore, the fact that Dr. Vivian had been operating under a mistaken premise about a patient's ability to kill herself while on 15-minute checks did not alter Dr. Songer's or Dr. Correll's opinion that Dr. Vivian had met the required standard of care in his treatment of Michelle.

{¶ 100} We find that it was within the province of the jury to consider the testimony regarding Dr. Vivian's mistaken premise and determine what weight, if any, the mistaken premise had on the level of care provided to Michelle by Dr. Vivian. The jury had before it contrary opinions by the experts, and it was up to the jury to determine what evidence it found more credible on the issue. *See Silver v. Jewish Home of Cincinnati*, 190 Ohio App.3d 549, 2010-Ohio-5314, ¶ 34 (12th Dist.). We will not reverse a jury verdict simply because the jury decided to assign more weight to the evidence presented by Dr. Vivian's experts than it did to the evidence presented by Stewart's experts. *See id.*; *Boeppler*, 2015-Ohio-156 at ¶ 23.

{¶ 101} Accordingly, based upon our review of the record, we conclude that the jury did not clearly lose its way in rendering judgment in favor of Dr. Vivian. The jury's verdict in favor of Dr. Vivian did not create a manifest miscarriage of justice as there was competent, credible evidence to support the verdict. Judgment in favor of Dr. Vivian was not against the manifest weight of the evidence. Stewart's fourth assignment of error is, therefore, overruled.

### E. Motion for Judgment Notwithstanding the Verdict

{¶ 102} Assignment of Error No. 5:

{¶ 103} THE COURT ERRED IN FAILING TO GRANT JNOV TO [STEWART]

WHERE ALL EXPERTS AGREED DR. VIVIAN ANALYZED THE FACTS OF DECEDENT'S SUICIDE THROUGH THE MISPERCEPTION THAT A PATIENT COULD NOT COMMIT SUICIDE ON A LEVEL OF OBSERVATION PROVIDING FOR 15 MINUTE CHECKS.

{¶ 104}  In his fifth assignment of error, Stewart argues the trial court erred in denying his motion for judgment notwithstanding the verdict.

{¶ 105}  We review a trial court's decision on a motion for judgment notwithstanding the verdict de novo.  *Briggs v. Franklin Pre-Release Ctr.*, 12th Dist. Madison No. CA2013-10-035, 2014-Ohio-2477, ¶ 8.  A favorable ruling on such a motion is not easily obtained.  *Orren v. BWF Corp.*, 12th Dist. Warren CA2013-11-112, 2015-Ohio-62, ¶ 13.  "The standard for granting a motion for judgment notwithstanding the verdict is the same as that for granting a motion for directed verdict."  *Id.*

{¶ 106}  "That is, when considering either motion, the evidence adduced at trial and the facts established by the admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made."  *Shell v. Durrani*, 12th Dist. Butler No. CA2014-11-232, 2015-Ohio-4140, ¶ 13, citing *Phipps v. Internatl. Paper Co.,* 12th Dist. Clinton No. CA2013-02-003, 2013-Ohio-3994, ¶ 11.  If the court finds that reasonable minds could not differ as to any determinative issue, then the court must sustain the motion.  *Id.*  On the other hand, if there is substantial competent evidence to support the nonmoving party, upon which reasonable minds might reach different conclusions, the motion must be denied.  *Id.*  Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling on a motion for judgment notwithstanding the verdict.  *Id.*, citing *Nickell v. Gonzales*, 17 Ohio St.3d 136, 137 (1985).

{¶ 107}  Stewart argues that based on the evidence presented at trial, the jury could have only drawn the conclusion that Dr. Vivian's assessment, treatment, and care of Michelle departed from the standard of care.  He asserts that "Dr. Vivian's misperception that a patient

could not commit suicide while on * * * 15-minute check[s] fell below the standard of care, and rendered him liable for decedent's death." However, as discussed in our resolution of Stewart's fourth assignment of error, there was testimony presented at trial that Dr. Vivian's assessment, treatment, and care was appropriate and within the acceptable standard of care for psychiatrists. The fact that Michelle was able to hang herself at Mercy does not necessarily equate to a breach of Dr. Vivian's duty of care. As one of Stewart's expert's acknowledged on cross-examination, it is possible for a patient to hang herself while on 15-minute checks and for there to be an absence of negligence. Further, although Dr. Vivian mistakenly believed that a patient could not commit suicide while on 15-minute checks, this does not change the fact that there was testimony from Dr. Vivian and two medical experts that under the circumstances presented by Michelle's case, ordering 15-minute checks met the standard of care.

{¶ 108} Stewart also argues that he is entitled to judgment notwithstanding the verdict because the evidence at trial demonstrated that "[i]f the level of observation had been increased it is probable that Michelle would have survived." In support of his argument, he relies on the fact that all of the experts agreed that it is "more probable than not" that elevating the level of observation would have prevented Michelle's suicide. Stewart then cites to the legal principle that "[i]n a medical malpractice action premised on a failure to properly diagnose or treat a medical condition which results in a patient's death, the proper standard of proof on the issue of causation is whether with proper diagnosis and treatment, the patient *probably* would have survived." *Jeffrey v. Marietta Mem. Hosp.*, 10th Dist. Franklin Nos. 11AP-492 and 11AP-502, 2013-Ohio-1055, ¶ 47.

{¶ 109} We note that even though the experts agreed that a higher level of observation could have prevented Michelle's death, this does not mean that the experts believed Dr. Vivian's treatment of fell below the standard of care. There was conflicting

testimony on this issue, with Stewart's experts opining that constant observation or one-to-one observation should have ordered for Michelle. Dr. Vivian's experts disagreed and testified that 15-minute checks were an appropriate level of observation meeting the standard of care. The testimony of Dr. Correll and Dr. Songer provided substantial competent evidence to sustain the verdict in Dr. Vivian's favor, and we cannot second guess the jury's determination of this issue.

{¶ 110} Accordingly, after viewing the entire record and construing the evidenced adduced at trial in favor of Dr. Vivian, as the nonmoving party, we find that the trial court properly denied Stewart's motion for judgment notwithstanding the verdict. Stewart's fifth assignment of error is, therefore, overruled.

## F. Dismissal of Juror

{¶ 111} Near the end of his appellate brief, Stewart attempts to set forth an assignment of error in a footnote. Stewart's footnote 23 states the following:

> Due to page limitations imposed by the Court, Appellant was unable to fully address the Sixth Assignment of Error, that the Trial Court erred in failing to excuse Juror Meadows. Juror Meadows should have been dismissed. His articulated prejudice against Appellant's claims was capable of and did infect the jury's deliberations.

However, neither the table of contents nor the body of Stewart's brief set forth a sixth assignment of error. Further, Stewart has not provided any specific argument or citation to authority or the record in support of his "sixth" assignment of error.

{¶ 112} App.R. 12(A)(2) provides that an appellate court "may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)." In turn, App.R. 16(A)(7), requires an appellant's brief to include an argument containing the appellant's contentions with respect to each

assignment of error presented for review and "the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."

{¶ 113} As Stewart failed to present any specific argument with respect to his contention that juror Meadows should have been dismissed and failed to cite to any portion of the record or to any legal authority in support of his claim, we disregard his "sixth" assignment of error for failure to comply with App.R. 12(A)(2) and 16(A)(7). *See Buckner v. Washington Mut. Bank*, 12th Dist. Butler No. CA2014-01-012, 2014-Ohio-5189, ¶ 47-48; *Ossai-Charles v. Charles*, 12th Dist. Warren Nos. CA2010-12-129 and CA2011-01-007, 2011-Ohio-3766, ¶ 21.

## IV. CONCLUSION

{¶ 114} Having found no merit to Stewart's assigned errors, we conclude that judgment in favor of Dr. Vivian was appropriate. The trial court did not err in denying Stewart's motion for judgment notwithstanding the verdict or his motion for a new trial.

{¶ 115} Judgment affirmed.

PIPER, J., concurs.

M. POWELL, P.J., concurs separately.

**M. POWELL, P.J., concurring separately.**

{¶ 116} I concur with the majority's judgment and its analysis of the issues but disagree with the majority's determination that the trial court's application of the apology statute is subject to a de novo review because the statute is ambiguous. Rather, the trial court's application of the statute and its determination that Dr. Vivian's statements should be excluded under the statute are subject to an abuse-of-discretion standard of review.

{¶ 117} The apology statute unambiguously provides that statements expressing

"apology, sympathy, commiseration, condolence, compassion or a general sense of benevolence" are excluded. *See* R.C. 2317.43(A). The General Assembly did not otherwise qualify the exclusion of such statements, by excepting statements that may also be construed as admitting fault from the scope of the statute. The determination of whether a statement is an expression of apology, etc., requires a trial court to examine what was said, the purpose of what was said, and the surrounding circumstances. This is a factual finding and is subject to an abuse-of-discretion standard of review.

{¶ 118} This case is much like *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507. In *Johnson*, the Ohio Supreme Court considered whether the apology statute applied to exclude a physician's statement to a distressed patient that "I take full responsibility for this. Everything will be okay." In finding that the trial court had properly excluded the statement pursuant to the apology statute, and reversing the court of appeals' decision, the supreme court reiterated the well-recognized rule that "[d]ecisions involving the admissibility of evidence are reviewed under an abuse-of-discretion standard of review. Similarly, decisions granting or denying a motion in limine are reviewed under an abuse-of-discretion standard of review." (Internal citation omitted.) *Johnson* at ¶ 22. The supreme court continued by observing that "[t]he trial court had determined that [the physician] was faced with a distressed patient who was upset and made a statement that was designed to comfort his patient. This is precisely the type of evidence that R.C. 2317.43 was designed to exclude as evidence of liability in a medical-malpractice case." *Id.* at ¶ 23. Clearly, in finding that the trial court had properly excluded the statement, the supreme court deferred to the trial court's determination that the statement was an expression of "apology, sympathy, commiseration, condolence, compassion or a general sense of benevolence."

{¶ 119} The supreme court in *Johnson* did not address the issue of whether the apology statute applies only to pure expressions of apology or whether the statute is

ambiguous. However, contrary to the prior Ninth Appellate District's opinion in *Davis v. Wooster Orthopaedics & Sports Medicine, Inc.*, 193 Ohio App.3d 581, 2011-Ohio-3199 (9th Dist.), the supreme court affirmed the exclusion of a physician's statement that was not a pure expression of apology and which included an admission of fault (i.e., "I take full responsibility for this"). *Johnson* at ¶ 23-24. Thus, the supreme court's ruling does not suggest that the statute is ambiguous with regard to whether it excludes only pure expressions of apology. Furthermore, the supreme court's ruling supports the proposition that a trial court's determination that a physician's admission of fault constitutes an expression of apology under the apology statute, is reviewed under an abuse-of-discretion standard.

{¶ 120} Whenever a trial court makes an evidentiary ruling pursuant to a statute or rule, the trial court necessarily construes the statute or rule as to what is permitted. This use of legal judgment does not convert such evidentiary rulings into an exercise in statutory construction subject to a de novo review. Otherwise, most rulings on the admission or exclusion of evidence, contrary to well-established precedent, would be subject to a de novo review.

{¶ 121} The trial court here made the factual determination that Dr. Vivian's statements were "an ineffective attempt at commiseration" and therefore ruled the statements inadmissible. This was not an abuse of discretion. Therefore, I agree with the majority's ultimate conclusion that the trial court's exclusion of Dr. Vivian's statements pursuant to the apology statue was proper.

{¶ 122} Stewart asserts that the supreme court only applied the abuse-of-discretion standard of review in *Johnson* after it had resolved issues of statutory interpretation, and that the discussion involving the abuse-of-discretion standard is merely dicta. The only issue of statutory interpretation concerned the application of the apology statute, as the accrual and

filing of the claim in *Johnson* straddled the effective date of the apology statute. Upon finding that the statute applied to the case before it, the supreme court held that the trial court's determination as to whether a statement was admissible under the statute is subject to an abuse-of-discretion standard of review, and chided the court of appeals for failing to "analyze under an abuse-of-discretion standard whether the trial court had acted unreasonably, arbitrarily, or unconscionably in reaching its conclusion" to exclude the statement.

{¶ 123} Based upon the foregoing, abuse of discretion is the proper standard of review. Determining the admissibility of evidence under R.C. 2317.43(A) is no different than determining the admissibility of evidence pursuant to any other evidentiary rule or statute. Doing so necessarily requires the trial court to exercise some degree of legal judgment of what the rule or statute provides.